IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | | |
|---|---|---|
| MONTANA CAMO, INC., | ) | |
| | ) | Case No. CV-08-71-BLG-RFC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | ORDER GRANTING CABELA'S |
| CABELA'S, INC., CABELAS.COM, | ) | MOTION FOR SUMMARY |
| INC., CABELA'S RETAIL, INC., and | ) | JUDGMENT RE: UTPA CLAIMS |
| JOHN DOES I-X, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## I.   INTRODUCTION

Pending before the Court are cross-motions for summary judgment (*Docs. 169 & 180*) relating to Montana Camo's Unfair Trade Practices Act ("UTPA") claim.  Although the Court previously denied Cabela's judgment as a matter of law on Montana Camo's UTPA claim, *Doc. 143* ("UTPA Order"), the only arguments Cabela's made at that time were that the UTPA claim was barred by the statute of limitations and that the UTPA requires injury to competition and Montana Camo could not prove such injury since the number of players in the western camouflage market increased during the relevant time period.  While the Court agreed with Cabela's that the UTPA requires injury to competition and not just injury to the

1

plaintiff's business, it agreed with Montana Camo that it had alleged sufficient

antitrust injury to survive Cabela's summary judgment motion and that genuine

issues of material fact precluded summary judgment as to the statute of limitations.

*Doc. 143.*  At that time, Montana Camo's evidence of antitrust injury was thin, but

since the Court had reopened discovery after allowing Montana Camo to

significantly amend its Complaint, Montana Camo was allowed to proceed with

the UTPA claim.  The second round of discovery has since closed and after further

review of antitrust law, the Court concludes that the facts do not support any cause

of action based on the UTPA.

## II.  BACKGROUND

As alleged in the Amended Complaint, Montana Camo's UTPA claim reads

as follows:

> 63. Cabela's misappropriation of Montana Camo's supply chain and
> business information to produce its own line of camouflage clothing
> in competition with Montana Camo combined with its website
> marketing efforts designed to divert to the Cabela's website any
> general web site searches made by consumers who are seeking to
> purchase "Montana Camo" products is an improper regulation of
> production of articles of commerce that prevents competition in the
> sale of merchandise in violation of MCA § 30-14-205.
>
> 64. This conduct has harmed and is harming Montana Camo in
> violation of MCA § 30-14-201 et seq.
>
> 65. Cabela's misappropriation has been willful and malicious,

2

therefore entitling Montana Camo to treble damages and attorney fees and costs under MCA § 30-14-222.

The facts cited by Montana Camo in these briefs, however, have nothing to do with supply chains or website searches.[1]  In essence, Montana Camo's UTPA claim is that Cabela's engaged in unlawful horizontal price fixing by requiring Montana Camo to ensure that Cabela's competitors did not sell Montana Camo products for less than Cabela's and terminating the relationship when it learned that Montana Camo did not do so.

Montana Camo's relationship with Cabela's began in 2000.  Initially, it was a vertical vendor/retailer relationship: Montana Camo provided finished products at wholesale prices for Cabela's to sell at retail prices.  Since Montana Camo's products were made in America, they cost more to produce and were therefore marketed as premium products at a premium price.  This continued throughout the relationship.  Depo. Clay Matthews 118:6-24 (June 10, 2009).  Although Montana Camo alleges Cabela's forced it to remain in the premium position, the Matthews deposition testimony it cites supports this assertion only marginally:

---

[1]Since the facts Montana Camo cites in support of its UTPA claim bear no relation to the allegations in the Amended Complaint, Cabela's argues the Court should reject the UTPA cause of action outright because courts need not address claims first raised on a motion for summary judgment, citing *Hancock v. Porter,* 531 F.3d 474, 480 (7th Cir. 2008).  Regardless, while the claims alleged in the complaint bear no resemblance to the current allegations, Cabela's has long been on notice of these allegations (*see Doc. 59*) and the Court prefers to address them on their merits.

Q.      So you think they're using your financial information in connection with their Seclusion 3D?

A.      In a roundabout way, I believe they used it to test the market. They used us as a test market to find out how much product they could put in the market and what the market would bear and what the pricing structure should be *and how they could get to price point people as opposed to premium product they told us we were supposed to be.* I think they used it to their total benefit.

*Id.* at 192:11-20.  According to Ev Tarrell of Cabela's, however, the parties agreed throughout the relationship to sell Montana Camo products at a premium price.  Depo. Ev.Tarrell 21:13-17; 28:12-29:21;30:4-21. (May 26, 2010).

In late 2003 or early 2004, at Cabela's urging, the relationship was altered with respect to two popular Montana Camo camouflage patterns, "Prairie Ghost Ultimate" and "River Ghost."[2]  Through this new arrangement, described in various ways, including as a licensing agreement, a manufacturing agreement, and a private label agreement, Cabela's would purchase  Prairie Ghost Ultimate and River Ghost fabric from Montana Camo and cut and sew its own garments. Montana Camo received a royalty of $.75 per yard of fabric, which amounted to

───────────────

[2]These patterns are the only patterns relevant to this motion.  Throughout this Order, where there is a reference to Montana Camo products or garments, it means lightweight garments, such as 7-button shirts or 6-pocket pants made from Prairie Ghost Ultimate or River Ghost fabric.

4

about $1.50 per 7-button shirt or pair of 6-pocket pants.  Under the prior relationship, the wholesale price was around $21.00 per garment, with the cost to Montana Camo being about $11.00.

Despite the new agreement, Cabela's retail price remained the same at around $40 for a shirt and $45 for a pair of pants.  At the same time it was selling the garments it had manufactured from raw Montana Camo fabric, Cabela's was also selling its "Seclusion 3D Open Country" products for $5 or $10 less, even though they were made from similar fabric and of the same cut as the garments it made from Montana Camo fabric.  As discussed above, Montana Camo claims Cabela's inflated the price on Montana Camo products and sold their own products at a lower price to damage Montana Camo, but there is also evidence that Montana Camo wanted its products marketed as premium products.

In 2005, Cabela's further altered the deal by reducing the $.75 per yard royalty paid to Montana Camo to $.50 per yard.  Cabela's claimed this reduction was necessary for it to compete in the marketplace, even though Montana Camo claims that Cabela's net profit on each garment was around $30.  Cabela's claimed the reduced royalty was justified because of the advertising promotion Montana Camo was receiving from having its products sold in Cabela's catalogs.

Significant to the instant motion, Montana Camo alleges Cabela's required

it to fix prices to ensure that Bass Pro Shops and other retailers did not sell

Montana Camo products for less than Cabela's.  In support of this allegation,

Montana Camo cites the deposition testimony of Ev Tarrell, a Cabela's employee:

> Q. Mr. Tarrell, regarding the price point arrangement, was it Cabela's
> expectation that Montana Camo garments would be sold by Bass Pro
> at the same price as Cabela's?
>
> A. It was our expectation that Clay would maintain that throughout
> the main industry, and that all, you know, of the major players in the
> industry, and really all players, for that matter, would maintain the
> prices he set up.  That's–That's the–That really has to happen for it all
> to work.
>
> Q. But it was your–Cabela's expectation that Montana Camo
> garments would be sold at the same price as what they were being
> sold by Cabela's?
>
> A. At?
>
> Q. At the premium price point arrangement?
>
> A. In all the retailers during the core season, yes.

Depo. Ev. Tarrell 43:7-22 (May 26, 2010).  Prior to this, Tarrell testified that

Montana Camo insisted throughout their relationship that Montana Camo products

be marketed as premium products at a premium price.  *Id.* at 28:13-29:17.

Moreover, Tarrell testified that any agreement or requirement as to the price point

for Montana Camo products involved retail prices, not the cost of the products or

wholesale prices.  *Id.* at 30:4-31:24.

At the same time Montana Camo alleges Cabela's required it to engage in horizontal price-fixing, "Montana Camo obviously disputes that it agreed to any price fixing agreement with Cabela's." *Doc. 171, p.4.*

In late 2005, Cabela's learned that Bass Pro Shops, its primary competitor, was selling the same Montana Camo products for $5 to $10 less than Cabela's catalog price.[3]  Although Cabela's claims that Montana Camo's wholesale price to Bass Pro Shops was less than the wholesale price Cabela's had previously paid, the deposition testimony cited in support is less than clear on this point.  *Doc. 183,* Cabela's Statement Undisputed Facts ("CSUF") at ¶ 15.  Similarly, Montana Camo claims that Bass Pro Shops was paying Montana Camo's wholesale price of about $21 per garment, but the declaration and deposition testimony cited in support of this claim does not establish this as fact.  *Doc. 172,* MCSUF ¶ 54.  Cabela's was upset by the Bass Pro Shops price because it gave the appearance that it was gouging its customers.  Cabela's also claims the Montana Camo

----

[3]Montana Camo's Statement of Undisputed Facts ("MCSUF") states that "sometime near the end of 2005, Cabela's learned that Montana Camo established a wholesale/vendor relationship with Cabela's primary competitor, Bass Pro." ¶ 53.  The deposition testimony that Montana Camo cites in support of this undisputed fact, however, requires some significant inferences before this fact can be established.  Depo. Ev Tarrell, 19:1 - 20:21 (May 26, 2010). Regardless, Cabela's does not dispute that it was upset that Bass Pro Shops was selling the same products for less or that this issue was one of the reasons it discontinued its relationship with Montana Camo.  Cabela's, however, does dispute that the Bass Pro Shops issue was the sole reason it ceased business with Montana Camo.

products would not be profitable if it sold them at the Bass Pro Shops price.

Montana Camo claims that the Bass Pro Shops issue caused Cabela's to pull its

products from its stores and catalogs without notice.  MCSUF ¶ 55.  But again, the

deposition testimony it cites fails to establish this as fact.  Depo. Ed Larson,

155:10-20.  Although he does not state the reason, Clay Matthews testified he

learned on December 18, 2006 that Cabela's no longer had a need for Montana

Camo.  In any event, while Cabela's did not expressly end the relationship until

December of 2006, there were no "significant dealings" between the two

companies in 2006.[4]  Depo. Robert Effinger 65:10-13.

The evidence as a whole indicates the Bass Pro Shops issue was the primary

reason Cabela's ended its relationship with Montana Camo.  Dale Douglas, of

Cabela's, testified at his individual deposition that there were "multiple reasons"

why the relationship with Montana ended, but the Bass Pro Shops issue was the

only reason he enumerated.  Depo. Dale Douglas, 36:19-39:7 (July 15, 2009).

Douglas testified as Cabela's 30(b)(6) Fed.R.Civ.P. deponent, a month after he

had listed only the Bass Pro Shops issue as the reason Cabela's terminated the

relationship, that the entry of camouflage industry leaders Mossy Oak and Realtree

---

[4]Cabela's continued to purchase some finished products, such as hats and t-shirts, from Montana Camo in 2006.

into the western camouflage market was a second reason.  Depo. Dale Douglas,

33:13-35:5 (August 12, 2009).

## III.  ANALYSIS

Summary judgment is proper when "the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of

law."  Fed.R.Civ.P. 56(c).  Although summary judgment is not favored in antitrust

cases, it is appropriate where the plaintiff fails to present evidence sufficient to

support a favorable finding.  *Thurman Industries, Inc. v. Pay 'N Pak Stores, Inc.,*

875 F.2d 1369, 1373 (9th Cir. 1989); *see also Bizzle v. Northern Montana*

*Healthcare, Inc.,* DV-95-149, 1999 Mont. Dist. LEXIS 1136, *4 (Warner, J., Mt.

Dist. Ct. August 4, 1999) (summary judgment appropriate in antitrust case where

there is no significant probative evidence supporting the complaint.).

Montana Camo alleges Cabela's has violated the following UTPA

provisions:

It is unlawful for a person or group of persons, directly or indirectly:

(1) to enter an agreement for the purpose of fixing the price or regulating
the production of an article of commerce;

(2) for the purpose of creating or carrying out any restriction in trade, to:
**** 

9

(b) increase or reduce the price of merchandise or commodities;

(c) prevent competition in the distribution or sale of merchandise or commodities;

(d) fix a standard or figure whereby the price of an article of commerce intended for sale, use, or consumption will be in any way controlled;

****

(h) enter into an agreement which binds any person not to manufacture, sell, or transport an article of commerce below a common standard or figure or which keeps such article or transportation at a fixed or graduated figure or by which the price of such article is settled so as to preclude unrestricted competition.

Mont. Code Ann. § 30-14-205.  Since the UTPA is an antitrust law modeled on the Sherman Act, designed to protect the public from monopolies and unfair competition, Montana Camo must prove Cabela's intended to harm competition and in fact did harm competition.  *Doc. 143, pp. 5-6.*  As discussed below, even where the facts could support a violation of these UTPA subsections, there  is no evidence of antitrust injury, only injury to Montana Camo.

First, Section 30-14-205(1) renders it unlawful to "enter an *agreement* for the purpose of fixing the price or regulating the production of an article of commerce."  Similarly, § 30-14-205(2)(h) prohibits *agreements* that prohibit the sale of goods below a certain price for the purpose of restricting trade.  Montana Camo argues it is entitled to judgment as a matter of law as to these subsections based on Ev Tarrell's testimony that Cabela's expected Montana Camo to ensure

10

that all retailers sold the garments at the same prices.  At the same time, however,

"Montana Camo obviously disputes that it agreed to any price fixing agreement

with Cabela's."  *Doc. 171, p.4*.  That Montana Camo did not agree to fix prices is

supported by the undisputed fact that Bass Pro Shops sold the products for less

than Cabela's.  Although the UTPA differs from the Sherman Act in that one

person alone may violate the Sherman Act, *Smith v. Video Lottery Consultants,*

*Inc.,* 858 P.2d 11, 13 (Mont. 1993), §§ 30-14-205(1) & (2)(h) expressly require an

"agreement" and there could be no agreement without Montana Camo.

Accordingly, Cabela's must be granted judgment as a matter of law as to the

alleged violations of §§ 30-14-205(1) & (2)(h).

Second, § 30-14-205(2)(b) renders it unlawful to increase or reduce the

price of merchandise or commodities for the purpose of creating or carrying out

any restriction in trade.  Montana Camo argues that Cabela's increased the price of

Prairie Ghost Ultimate products by $10 relative to Cabela's Seclusion 3D Open

Country products.  Even if there is an issue of material fact as to whether Cabela's

forced Montana Camo products into the premium price point or whether the

parties agreed to market Montana Camo goods at a premium price point because

Montana Camo's American-made goods cost more to produce, Cabela's has

established that the prices it charged for Prairie Ghost Ultimate and Ridge Ghost

garments were consistent throughout the relationship.  Cabela's SUF, ¶¶ 11-12.

Moreover, Montana Camo cites no authority for the proposition that an antitrust violation occurs where a retailer sets different prices for different products.  On the contrary, a seller's ability to set their own prices promotes competition rather than limits it.  *See Costco Wholesale Corp. v. Maleng*, 522 F.3d 874, 900 (9th Cir. 2008).  Competition was furthered and the consuming public benefitted by having a choice between Montana Camo's premium and Cabela's price-point garments.  Any injury resulting from the difference in prices between Seclusion 3D Open Country and Montana Camo's patterns may have injured Montana Camo, but did not injure competition.  Since the UTPA plaintiff must prove harm to the economy rather than harm to his business, *Bizzle.* at *15, Cabela's must be granted judgment as a matter of law as to subsection 30-14-205(2)(b).

Third, § 30-14-205(2)(c) makes it unlawful to "prevent competition in the distribution or sale of merchandise or commodities" "for the purpose of creating or carrying out any restriction in trade."  The factual basis for this claim is Cabela's requirement that Montana Camo ensure that Bass Pro Shops and other retailers did not sell the Montana Camo products for less than Cabela's and Cabela's termination of the relationship when Montana Camo failed to do so.  As an initial

12

matter, Cabela's termination of the relationship does not give rise to an antitrust

violation since there was no conspiracy to do to so.  *Moore v. James H. Matthews*

*& Co.*, 550 F.2d 1207, 1220 (9th cir. 1977); *see also Sadler v. Rexair,* 612 F.Supp.

491, 494 (D. Mont. 1985) (antitrust law does not prevent parties from deciding

independently with whom it will deal).  But since there is no dispute that Cabela's

expected Montana Camo to ensure that other retailers maintained the same retail

prices, the facts could support a violation of § 30-14-205(2)(c) if, as discussed

below, Montana Camo can prove an unreasonable restraint on trade.

Finally, § 30-14-205(2)(d) prohibits, for the purpose of creating or carrying

out any restriction in trade, the fixing of a standard or figure whereby the price of

an article of commerce will be in any way controlled.  Montana Camo alleges

Cabela's maintained control of an inflated profit margin by continuing to sell

Montana Camo products for $45 after it reduced its cost for those products

through the licensing agreement.  Although it is disputed whether it was Cabela's

that insisted on the premium price for Montana Camo products or whether this was

agreed upon, Cabela's is free to set prices as it sees fit so long as it is not

conspiring with competitors.  If anything, Cabela's violated § 30-14-205(2)(d) by

requiring Montana Camo to ensure that other retailers did not sell Montana Camo

products for less than Cabela's.  Whether this is an antitrust violation is another

question.

Accordingly, the only allegation(s) that are cognizable under the plain language of the UTPA is that Cabela's violated §§ 30-14-205(2)(c) or (d) by requiring that Montana Camo ensure that Bass Pro Shops and other retailers did not sell the Montana Camo products for less than Cabela's.  Since the focus of antitrust law is on promoting competition, not protecting competitors, and an antitrust violation requires harm to the economy rather than harm to the plaintiff's business, the question then becomes whether this activity is one that UTPA, as an antitrust law, was intended to address.  *See Bizzle,* at \*12-15 (the proponent of a UTPA claim "must establish a violation of antitrust laws and actual injury attributable to something antitrust laws were designed to prevent.").

A restraint on trade can be held unlawful either because it falls within a class of restraints deemed *per se* unreasonable or because it violates the "Rule of Reason."  *Federal Trade Comm. v. Indiana Federation of Dentists,* 476 U.S. 447, 458 (1986).  Here, Montana Camo does not even attempt a Rule of Reason analysis,[5] claiming it is unnecessary (*Doc. 205, p. 20*) because this case presents a

---

[5]For example, while Montana Camo loosely defines the relevant market as the "western camouflage market," it makes no attempt at proving a substantially adverse effect on competition in the western camouflage market through either an increase in prices, a decrease in the quantity of suppliers, or a decrease in the quality of the product.  *See Bizzle*, at \* 15.

horizontal business arrangement among competitors that is *per se* illegal. *Costco Wholesale Corp. v. Maleng,* 522 F.3d 874, 898 n.19 (9th Cir. 2008). "Horizontal price-fixing occurs when firms competing at the same level of the market structure (e.g., a group of manufacturers or a group of distributors) agree to fix or otherwise stabilize the prices that they will charge for their products or services." William C. Holmes, *Antitrust Law Handbook* § 2:11 (West 2010). But again, although the relationship between Montana Camo and Cabela's can be considered horizontal in that Prairie Ghost Ultimate competed with Seclusion 3D Open Country, Montana Camo admits that it did not agree with Cabela's to fix prices. Further, in light of the fact that Bass Pro Shops sold Montana Camo garments for less than Cabela's, the undisputed evidence is that prices were not fixed.

Finally, the parties devote some argument in their briefs to the UTPA claim that was actually pleaded in the Amended Complaint: that Cabela's (1) misappropriated Montana Camo's supply chain to create its competing camouflage patterns and (2) purchased internet key words in order to direct internet searches for "Montana Camo" to Cabela's website in order to restrict competition. Since Montana Camo provides no authority that such conduct is a *per se* violation of the antitrust laws and has not even attempted to show how such conduct violates the Rule of Reason, Cabela's must also be granted summary judgment as to this claim.

15

In the end, the record in this case makes clear that while Cabela's employed underhanded business tactics in its dealings with Montana Camo, the only injured party is Montana Camo.  Montana Camo cannot convert the losses it sustained as a result of its dealings with Cabela's into an antitrust claim without demonstrating the type of injury that antitrust law was designed to prevent.  *Sadler,* 612 F.Supp. at 494-95.

## IV.   ORDER

For those reasons, **IT IS HEREBY ORDERED** that Cabela's Cross-Motion for Summary Judgment Dismissing Plaintiffs' Montana Unfair Trade Practices Act Claims (*Doc. 180*) is **GRANTED** and Plaintiffs' Motion for Summary Judgment Re: Montana Unfair Trade Practices Act (Doc. 169) is **DENIED.**

Dated this 11th day of January, 2011.

_/s/ Richard F. Cebull_____
Richard F. Cebull
United States District Judge

16