IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| MONTANA CAMO, INC., | Case No. CV-08-71-BLG-RFC |
| Plaintiff, | |
| v. | |
| CABELA'S, INC., CABELAS.COM, INC., CABELA'S RETAIL, INC., and JOHN DOES I-X, | ORDER GRANTING CABELA'S MOTION FOR SUMMARY JUDGMENT DISMISSING COPYRIGHT CLAIMS |
| Defendants. | |

## I.   INTRODUCTION

Montana Camo's remaining copyright infringement claim[1] alleges Cabela's infringed Montana Camo's Prairie Ghost Ultimate and River Ghost copyrights by placing Cabela's neck labels[2] on the garments Cabela's manufactured from fabric it purchased from Montana Camo.  Cabela's argues it cannot be liable for

---

[1] Montana Camo had also asserted a trademark counterfeiting claim under 15 U.S.C. § 1117(c), but this claim has been withdrawn.  *Doc. 213, p. 29.*

[2] A neck label is sewn on the back of the collar on the inside of the garment and typically depicts the logo of the garment manufacturer.

1

copyright infringement because it had a non-exclusive license to make garments with the Montana Camo fabric and that nothing in the licensing agreement prohibited it from using its own neck labels.  Because the only evidence the agreement prohibited Cabela's from placing its neck labels on the garments is a conclusory statement in Clay Matthews's affidavit, which is in conflict with a prior affidavit, Cabela's motion must be granted.

## II.   FACTS

Clay Matthews incorporated Montana Camo, Inc. to market the camouflage patterns he designed specifically for western environments.  Matthews's sagebrush camouflage patterns were the first of their kind.  In 2000, Cabela's began selling Montana Camo camouflage through its various retail channels.  In 2003, Cabela's began selling its own sagebrush camouflage pattern, Seclusion 3D Open Country, alongside, and in competition with Montana Camo's.  In late 2003 or early 2004, Cabela's further strained the relationship by coercing Montana Camo into selling it raw fabric in the two most popular camouflage patterns, "Prairie Ghost Ultimate" and "River Ghost,"[3] so that Cabela's could increase its profits by cutting and sewing its own garments.  Under the new relationship, Montana Camo

---

[3] These patterns are the only patterns relevant to this motion.  Throughout this Order, where there is a reference to products or garments, it means jackets, 7-button shirts, or 6-pocket pants made from Prairie Ghost Ultimate or River Ghost fabric.

received a royalty of approximately $1.50 per garment, whereas before, Montana Camo made approximately $10 per garment. In 2005, Cabela's further reduced the royalty it paid to Montana Camo, to $1 per garment.

Cabela's has characterized the Prairie Ghost Ultimate/Ridge Ghost agreement as follows:

>(1) Cabela's would order a certain amount of garments from its garment manufacturer (Lee Fu), and tell Lee Fu where to obtain the Montana Camo fabric and hangtags[4] for the garments to be produced;
>
>(2) Cabela's would send Lee Fu a specification sheet for each type of garment;
>
>(3) Lee Fu would contact Montana Camo to request the fabric and arrange payment for the fabric;
>
>(4) Montana Camo would accept payment for the fabric from Lee Fu (which would include an agreed-upon royalty from Cabela's), provide Lee Fu with its printer information so that Lee Fu could order the fabric, and instruct its printer or converter (Royal Carolina or SRI) to release its fabric to Lee Fu;
>
>(5) Lee Fu would coordinate with its freight agent to have the Montana Camo fabric picked up from Montana Camo's printer and sent to Lee Fu's facility in Macau by air or surface transport (depending on Cabela's urgency);
>
>(6) Lee Fu would also request the amount of Montana Camo hangtags it would require for the garments it was producing for Cabela's from Montana Camo fabric;

---

[4]A hangtag is usually applied to the sleeve or zipper of a garment that depicts a particular proprietary technology utilized in the garment, such as "Gore-Tex" or "Scent-Lok."

(7) Montana Camo would ship Lee Fu the requested hangtags;

(8) Lee Fu would use the Montana Camo fabric to manufacture garments to Cabela's specifications and in the amount of each garment Cabela's had requested;

(9) Lee Fu would ship (by air or ocean) the finished garments to Cabela's;

(10) Cabela's would pay Lee Fu for the finished garments; and

(11) Cabela's would place the finished garments in its distribution chain for sale.

*Doc. 190, Cabela's Statement of Undisputed Facts ("SUF") ¶ 17*. Although Montana Camo has not expressly objected to Cabela's characterization of the agreement and Clay Matthews's testimony confirms many of them, *Depo. Clay Matthews,* 120:5-123:23 (June 10, 2009), Clay Matthews states in a subsequent affidavit that Lee Fu was supposed to put Montana Camo hangtags and labels on the garments.  *Aff. Clay Matthews,* ¶ 9 (June 29, 2010)*, attached as Ex. F to Montana Camo's Statement of Genuine Issues ("SGI"), Doc. 214.*  Significantly, Clay Matthews had also averred previously that the parties had no written agreement or oral discussions concerning the use of Cabela's neck labels. *Aff. Clay Matthews,* ¶ 16 (Sept. 11, 2009).

Pursuant to the agreement, in January 2004, Lee Fu ordered 15,000 yards of Prairie Ghost Ultimate and 10,000 yards of River Ghost fabric from Montana

Camo. *SUF,* ¶ 25. Montana Camo fulfilled the order and Lee Fu paid Montana Camo. *SUF,* ¶¶ 26-29. At Lee Fu's request, Montana Camo sent approximately 7500 hangtags to Lee Fu for placement on the garments. *SUF,* ¶¶ 30-33. Montana Camo did not provide Lee Fu with neck labels to be sewn into the Prairie Ghost Ultimate and Ridge Ghost Garments. *SUF,* ¶ 34. In total, Lee Fu provided Cabela's with 7,036 Prairie Ghost Ultimate and 2,614 River Ghost garments for the Fall 2004 season. *SUF,* ¶ 37. All of these garments had Cabela's neck labels and Montana Camo hangtags. *SUF,* ¶ 38.

In November of 2004, Cabela's ordered Prairie Ghost Ultimate and River Ghost garments from Lee Fu for the Fall 2005 season. *SUF,* ¶ 40. Since Lee Fu still had leftover fabric from the Fall 2004 order, it only ordered 3,365 yards of Prairie Ghost Ultimate fabric from Montana Camo, for which Montana Camo was paid. *SUF*, ¶¶ 41-43. In May of 2005, Lee Fu ordered more hangtags from Montana Camo. *SUF,* ¶ 46. Lee Fu delivered 1,880 Prairie Ghost Ultimate and 310 River Ghost garments to Cabela's for the Fall 2005 season. *SUF*, ¶ 47. These garments also had Montana Camo hangtags and Cabela's neck labels. *SUF*, ¶ 48.

Cabela's did not order any Montana Camo garments from Lee Fu for the Fall 2006 season. *SUF,* ¶ 49. Cabela's did purchase complete hats, t-shirts, and accessories in Prairie Ghost Ultimate and River Ghost through 2006. *SUF*, ¶ 53.

5

Cabela's terminated its relationship with Montana Camo in 2006.

### III. ANALYSIS

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Assuming adequate time for discovery and an appropriate motion, Rule 56 mandates summary judgment against a party who fails to establish an essential element of its case, an on which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

A plaintiff asserting a claim for copyright infringement must prove two elements: (1) the ownership of a valid copyright and (2) copying of constituent elements of the copyrighted work that are original. *Funky Films, Inc. v. Time Warner Entertainment Co.,* 462 F.3d 1072, 1076 (9th Cir. 2006). Here, it is undisputed that Montana Camo owned valid copyrights for the Prairie Ghost Ultimate and River Ghost camouflage patterns[5] and that Cabela's directed the manufacture of clothing using the copyrighted patterns. Cabela's argues, however, that it cannot be liable for copyright infringement because every single garment was manufactured from fabric it purchased from Montana Camo through

---

[5]These are the only camouflage patterns relevant to this motion.

6

the licensing agreement. *I.A.E., Inc. v. Shaver,* 74 F.3d 768, 776 (7th Cir. 1996)(the existence of an exclusive or non-exclusive license is an affirmative defense to copyright infringement), *citing Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 559 (9th Cir.1990). Although section 204 of the Copyright Act requires that the transfer of the exclusive rights granted to copyright owners be in writing, 17 U.S.C. § 204(a), a nonexclusive license may be granted orally or implied by conduct. *Micro Star v. Formgen Inc.*, 154 F.3d 1107, 1113 (9th Cir. 1998) *citing Effects Assocs., Inc.,* 908 F.2d at 556. Since the evidence indicates Montana Camo licensed its fabrics to other product manufactures, any license granted to Cabela's was non-exclusive.

Cabela's cites Clay Matthews's deposition testimony that there was a written license agreement, *Depo. Clay Matthews,* 123:21-23 (June 10, 2009), but no written licensing agreement has been produced to the Court. Moreover, Matthews also testified that Montana Camo sent Cabela's a licensing agreement for it to sign, but that Cabela's either never responded or refused to sign a written licensing agreement. *Depo. Clay Matthews,* 115:9-14 (April 7, 2010)*, Ex. K to SGI, Doc. 214*. This is confirmed by Ev Tarrell of Cabela's, who testified that Cabela's found a "verbal agreement" to be "workable." *Depo. Ev. Tarrell* 69:7-19 (May, 26, 2010)*, SGI,* ¶ 56.

Nonetheless, Montana Camo argues there was no oral or implied license. Specifically, it argues that *Effects Associates*, the authority Cabela's cites in arguing for an implied license, is distinguishable because it was a "work for hire" case and Montana Camo did not create the relevant camouflage patterns for use by, and at the request of, Cabela's.  Rather, Montana Camo notes it had already created the patterns when Cabela's asked to purchase the raw fabric.  Similarly, Montana Camo claims the elements of an implied license found in *Asset Marketing Systems, Inc. v. Gagnon,* 542 .F3d 748, 754 (9th Cir. 1996), are inapplicable because the instant case is not a "work for hire" case.  Regardless, even if there was no implied licence as defined in those cases, Montana Camo admits–and the parties' course of conduct proves–that the parties entered into an agreement whereby Cabela's would purchase Prairie Ghost Ultimate and River Ghost fabric from Montana Camo and cut and sew its own garments for distribution through its various retail channels.  Doc. 214, SGI ¶¶ 6-16; *Depo. Clay Matthews* 120:5-122:7 (June 10, 2009)*; see also SUF,* ¶¶ 3, 6, 15-19.  In fact, Montana Camo's own documents list Cabela's as a licensee for pants, button downs, and jackets–the same type of garments created by Lee Fu for Cabela's for the 2004 and 2005 Fall hunting seasons.  *Doc. 190, SUF, Ex. D.*  Accordingly, even if there was no written license, the existence of non-exclusive license cannot

8

be disputed.

The questions then become whether the prohibition on Cabela's hangtags was a term of the license, and if so, does Cabela's alleged breach of the license state a claim for copyright infringement, or should Montana Camo have alleged a breach of contract claim. This is because generally, a copyright owner granting a nonexclusive license waives his right to sue the licensee for copyright infringement and can sue only for breach of contract. *Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1121 (9th Cir. 1999) (internal quotations omitted). But "if a license is limited in scope and the licensee acts outside the scope, the licensor can bring an action for copyright infringement." *Id.* Where, as here, the existence of a license is not in dispute, only its scope, the copyright owner bears the burden of proving that the defendant's copying was unauthorized. *Netbula, LLC v. BindView Development Corp.,* 516 F.Supp.2d 1137, 1151 (N.D. Call 2007). Finally, since it is essentially an issue of contract construction, this is an issue for the court to decide as a matter of law. *Id.; see also Fireman's Fund Ins. Co. v. City of Lodi, California,* 302 F.3d 928, 951, n.21 (9th Cir. 2002) (the construction of a contract is a matter of law for the Court to decide).

Here, the Court does not need to determine whether Montana Camo's allegation are properly characterized as a copyright infringement or a breach of

9

contract action because Montana Camo has not met its burden of proving that Cabela's was prohibited from placing its neck labels on the garments, either as a restriction on the scope of the license or as a term of the licensing agreement. Most importantly, although Clay Matthews avers that Montana Camo never authorized Cabela's to place its label on the garments Cabela's created from the Montana Camo fabric, *Aff. Of Clay Matthews,* ¶ 10 (Sep. 11, 2009), *attached as Ex. C to SGI*, and that Cabela's agent was supposed to "'cut and sew' garments and deliver them to Cabela's with Montana Camo hangtags and labels," *Aff. Clay Matthews,* ¶ 9 (June 29, 2010), *attached as Ex. F to SGI*, *Doc. 214*, he also avers there was no written agreement and no oral discussions on this issue. *Aff. Of Clay Matthews,* ¶ 16 (Sep. 11, 2009), *attached as Ex. C to SGI*. If the issue was never discussed, it could not have been part of the agreement. Moreoever, the statements in Clay Matthews's affidavit are not corroborated by any other evidence and a party opposing summary judgment cannot rely on conclusory allegations unsupported by factual data to create an issue of material fact. *Hansen v. United States,* 7 F.3d 137, 138 (9th Cir. 1993). The fact there was no agreement concerning neck labels is consistent with the fact that Montana Camo never sent neck labels for Lee Fu to place on the garments. *SUF,* ¶ 34.

      Montana Camo nevertheless argues that a reasonable jury could conclude

Cabela's was prohibited from placing its neck labels on the garments from Montana Camo's agreements with other parties.  For example, Montana Camo cites an agreement it entered into with SureFoot, executed roughly a year after the license agreement with Cabela's, that required SureFoot to consult with Montana Camo on advertising and gave Montana Camo the right to inspect products and advertising for quality control.  *SGI, ¶¶ 75*.  Not only is the SureFoot agreement silent as to labeling, the Court is unaware of any provision of law holding that terms from a subsequent agreement with a different manufacturer should be considered terms of the agreement with Cabela's.

In a similar attempt at proof, Montana Camo's argues Cabela's Fall 2004 catalog is strong evidence that Cabela's was prohibited from placing its neck labels on the garments it created from the Montana Camo fabric.  Specifically, Montana Camo notes that Cabela's Fall 2004 catalog used a photograph provided by Montana Camo of a shirt with a Montana Camo neck label, *SGI, ¶ 27*, while the actual garments had Cabela's neck labels and later Cabela's catalogs advertised "Cabela's Montana Camo Ghost Series." *SGI, Ex. T*.  This argument is likewise for naught.

There being nothing prohibiting Cabela's from placing its own neck labels on the garments it created with fabric purchased from Montana Camo, Montana

Camo's copyright infringement claim necessarily fails. Accordingly, the Court does not need to consider Cabela's laches and statute of limitations arguments.

## IV.  ORDER

For those reasons, **IT IS HEREBY ORDERED** that Cabela's Motion for Summary Judgment Dismissing Copyright and Counterfeiting Claims (*Doc. 186*) is **GRANTED**.

Dated this 15th day of February, 2011.

>　　　　　　　　　　　　　*/s/ Richard F. Cebull*_____
>　　　　　　　　　　　　　Richard F. Cebull
>　　　　　　　　　　　　　United States District Judge